**STATE of Missouri, Respondent,**

v.

**Marcus A. BUSEY, Appellant.**

**No. WD 60988.**

Missouri Court of Appeals,
Western District.

Oct. 21, 2003.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 25, 2003.

As Modified Nov. 25, 2003.

Application for Transfer Sustained
Jan. 27, 2004.

Case Transferred Sept. 28, 2004.

Court of Appeals Opinion Readopted
Oct. 5, 2004.

Amy Marie Bartholow, State Public Defender, Columbia, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Joel A. Block, Asst. Atty. Gen., Jefferson City, MO, for Respondent.

Before HAROLD L. LOWENSTEIN, P.J., JAMES M. SMART, JR., and EDWIN H. SMITH, JJ.

JAMES M. SMART, JR., Judge.

Marcus Busey appeals his conviction of second degree murder, second degree robbery, and two counts of armed criminal action. Because we hold that the prosecution's inadvertent but direct comment on Busey's failure to testify was prejudicial, we reverse the convictions of the charge of murder and the associated armed criminal action and remand for a new trial as to those charges. Finding no prejudice as to the remaining charges, we affirm the conviction of robbery second degree and armed criminal action.

## Statement of Facts

On the evening of January 14, 2001, Marcus Busey and Jamell Page decided to rob Michael Mason, a local drug dealer. While at a friend's house, Page called Mason and asked him to come over to sell them drugs. After Mason arrived at the house in his truck, Page and Busey went outside and got inside Mason's truck. Either during or after the robbery, Page stabbed Mason a total of seven times, killing him. Whether Busey helped Page commit the murder of Mason or dispose of the murder weapon is in dispute.

Two days after the murder, the police arrested Busey and Page. Page confessed to the killing and stated that Busey had assisted him in the robbery and murder. Busey, at first, claimed that he had been at his girlfriend's house the evening of January 14. Then he changed his story and said that he had been at another friend's house. Busey changed his story again, stating that he had gone with Page to buy some drugs from Mason but had not been in Mason's truck when Page stabbed Mason. After being confronted with Page's confession, Busey then admitted in a written statement that Page had wanted to rob Mason of "weed" and that Busey had agreed to go with Page. Busey said that he took a metal pipe with him. He got in the back of Mason's vehicle, while Page got in the front passenger seat. Busey admitted that, as part of the robbery, he used the metal pipe by putting it against Mason's neck and "pulling back for about 10 to 15 seconds." He acknowledged that he then grabbed the "sack of weed" and jumped out of the truck and ran, thinking that Page was running with him. When he realized Page was not with him, he went

back and saw that Page had stabbed Mason after Mason got out of the vehicle.

Busey was charged with second degree murder, § 565.021 RSMo, second degree robbery, § 569.030 RSMo, and two counts of armed criminal action, § 571.015 RSMo. Busey was offered a plea agreement but declined to accept. Page was similarly charged and also declined to accept a plea agreement. The decision was made to try Page and Busey separately, with Busey being tried first.

On the morning of the first day of Busey's trial, just before voir dire was to begin, the prosecutor saw Rick Euler, Page's attorney, in the halls of the courthouse. Euler was at the courthouse on another matter. The prosecutor discussed once again with Euler the possibility of Page testifying against Busey in exchange for a plea agreement. Under the prosecution's offer, Page would serve twenty-five years for the charge of second degree murder and fifteen years for the charge of armed criminal action, with the dismissal of the second degree robbery charge and the second charge of armed criminal action. Euler left to discuss the plea offer with Page.

Before voir dire in Busey's trial, the prosecutor informed Busey's attorney of the offer of a plea agreement Page was considering. Both attorneys knew that if a plea agreement was reached, Page would be available to testify. Busey's attorney requested a continuance, which the court denied. The next day, Page accepted the plea agreement. On the morning of the third day of trial, the State moved to endorse Page as a witness. The trial court declined to allow endorsement of Page as a witness in the State's case, but declined to preclude Page from testifying as a rebuttal witness. The court specified, however, that because of the lateness of the hour as to Page's availability, Page's rebuttal testimony would be limited to the facts contained in his written confession to the police, a document which Busey had obtained almost a year before trial. Busey's attorney also took a deposition from Page during a recess.

Busey elected not to testify in his own defense. Accordingly, Page never testified in rebuttal. Busey was found guilty on all counts by the jury, and sentenced to concurrent terms of thirty years' imprisonment for second degree murder and twenty years for armed criminal action, and consecutive terms of five years' imprisonment each for second degree robbery and the second count of armed criminal action.

■ Busey's first point on appeal is that the trial court abused its discretion when it allowed Jamell Page to testify as a witness, or, in the alternative, declined to grant Busey's request for a continuance to allow the defense to prepare a new trial strategy. We disagree. Although Busey makes much of the surprise of Page's availability, Busey had been aware that negotiations had been discussed between the State and Page for months. Although the negotiations had apparently ceased, Busey knew that the negotiations were subject to revival at any time. It should also be noted that the court did not allow a late "endorsement" of Page, as the appellant asserts. The court did not allow Page to testify in the case-in-chief. The court limited Page's testimony to rebuttal, and limited it to the substance of Page's earlier statement. It is agreed that there was no bad faith on the part of the prosecution. Busey's attorneys were also given extra time to depose Page, even though his testimony would have been limited to the written confession, a document with which Busey and his attorneys should have been very familiar. After the deposition, Busey did not request a continuance to conduct any further investigations. It is not clear

to this court how a further continuance was required to ensure that Busey received a fair trial when Page's testimony would have been limited to information which Busey had adequate time to investigate. Although the timing of Page's availability may have required some strategy adjustments for Busey, in view of the approach the defense had chosen, we cannot say that the trial court abused its discretion in its rulings in this regard.

■ Busey's second point on appeal is that the trial court erred in not granting Busey's request for a mistrial when the prosecutor mentioned during closing argument that Busey had not testified in his own defense.

During closing argument, the prosecutor commented on Busey's failure to testify:

State: When you don't have evidence to present yourself, you attack the evidence that is presented. Defense Attorney 101.

Defense: Objection, Your Honor. May we approach?

(Counsel approached the bench and the following proceedings were held:)

Court: Is there an objection?

Defense: Yes, Your Honor. He's—

Court: On what basis?

Defense: He's shifting the burden. He said that when you don't have evidence to present, you attack the evidence that's presented, Defense 101. Your Honor, that's wholly inappropriate. That's shifting the burden. They have the burden. I don't have to present any evidence whatsoever.

Court: Overruled. You may proceed.

(The proceedings returned to open court.)

State: When you don't have evidence to present, you attack the evidence presented, Defense Attorney Rule 101.

Hooded Sweatshirt. Called it black hooded sweatshirt first time she said. After that, it was hooded sweatshirt. The testimony from Detective Wilson was that the hooded sweatshirt that Jamell Page had on was a gray hooded sweatshirt. You will recall that.

What witness said Marcus Busey could not testify? Not one single witness. The waiver of rights form says this man completed the tenth grade, and the inference that they would have you draw—

Defense: Your Honor, may we approach please?

(Counsel approached the bench and the following proceedings were held:)

Court: Yes?

Defense: He just argued no, no witness indicated that Mr. Busey could not testify. At this time we move for a mistrial. It's wholly inappropriate on whether or not a witness—

Court: When did he say no witness— anything about Mr. Busey testifying? He was talking about reading.

Defense: But he said, "testify." I'm asking you to check the record. We're requesting a mistrial.

Court: Well, if there was a misstatement—I don't believe it was—but if you would clarify your statement. Overruled.

(The proceedings returned to open court.)

State: Did any witness say that Marcus Busey could not read?

The State had also mentioned Busey's right to testify earlier in the closing argument. The defense counsel had objected and the trial court sustained the objection. No curative instruction was requested by the defense or given by the trial court.

■ The Fifth Amendment to the United States Constitution guarantees the

right to an accused person to not "be compelled in any criminal case to be a witness against himself." Section 546.270 RSMo.2000, provides that:

> If the accused shall not avail himself or herself of his or her right to testify . . . it shall not be construed to affect the innocence or guilt of the accused, nor shall the same raise any presumption of guilt, nor be referred to by any attorney in the case, nor be considered by the court or jury before whom the trial takes place.

A direct reference to an accused person's failure to testify occurs when the prosecutor utters such words as "defendant," "accused," and "testify" or their equivalent. *State v. Lawhorn*, 762 S.W.2d 820, 826 (Mo. banc 1988). An indirect reference is one reasonably likely to direct the jury's attention to the defendant's failure to testify. *Id.*

■ In this case, there was a direct reference to defendant Busey's failure to testify when the prosecutor stated: "What witness said Marcus Busey could not testify?" This comment was preceded by the comment: "When you don't have evidence to present, you attack the evidence presented." "Where an objection is made and overruled, a direct reference to the failure of the defendant to testify will almost invariably require reversal of the conviction[.]" *State v. Neff*, 978 S.W.2d 341, 344 (Mo. banc 1998).

■ Whether a particular improper statement is so prejudicial under the facts in a particular case as to necessitate a reprimand of counsel or a discharge of the jury is largely within the discretion of the trial court. *State v. Pope*, 50 S.W.3d 916, 922 (Mo.App.2001). The trial court is given this discretion because it is in a better position to observe the proffered evidence and its impact on the jury. *Id.* Appellate review is for an abuse of discretion. *Id.* "Judicial discretion is deemed abused only when a trial court's ruling is clearly against the logic of the circumstances then before it and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Neff*, 978 S.W.2d at 345.

■ Not every reference to the defendant's failure to testify mandates a mistrial. The Missouri Supreme Court held in *State v. Neff* that when a trial court takes prompt and appropriate remedial action to protect the defendant by instructing the jury to disregard the remark, a mistrial is generally not warranted. *Id.* When considering the prejudicial effect of an improper statement, the appellate court must consider the context in which it occurred. *Id.*

Here, the trial court gave no limiting instruction and overruled the defendant's request for a mistrial. The trial court did not even hear the word "testify" but instead thought that the prosecution was referring to whether the defendant was able to read.[1] We cannot assume that the transcript is incorrect, especially when the defense, along with the court reporter, obviously heard the word "testify."

The State argues that the comment was fleeting, inadvertent, and a slip of the tongue. While it was inadvertent, it cannot be said that the comment was completely isolated: the direct reference to Busey's failure to testify followed an indirect reference. The statements brought attention to Busey's constitutionally protected decision not to take the stand in his

---

1. The prosecution remarks were intended as a response to an unsupported assertion in the defense argument that Busey could not read.

own defense. The comments also came at the very end of the trial, during closing argument. The evidence of Busey's guilt of participation in the murder was substantial, but the jury also had before it the pre-trial statement of Busey which was the basis of an argument that the robbery was complete and that Busey had withdrawn before the murder. We cannot say that conviction of murder was a certainty and that the comment was harmless, no matter how inadvertent it may have been.[2]

Had the trial court apprehended the fact that the prosecutor had made an improper comment, almost certainly it would have granted at least a limiting instruction, if not a mistrial. Because the trial court took no action to limit the prejudice by proper instruction, however, we find ourselves unable to conclude there was no prejudice.

The State argues that once a defendant states to the jury that he will testify and then fails to do so, then the prosecutor is free to comment on that fact, citing *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and *State v. Dollens*, 878 S.W.2d 875, 876–77 (Mo.App. 1994).

During voir dire, the defense counsel made the following statements:

Defense: As I've indicated earlier, the defense does not have to prove anything and it's not our burden by any means. We do anticipate that Mr. Busey will testify sometime, I don't know when it will be, depending on the course of the trial. Does anyone here as they sit here today believe that they must hear from Mr. Busey before they could render an opinion of not guilty?

(No response.)

Defense: I see no hands. Does anyone here believe that they must hear from Mr. Busey for a fair consideration of the evidence?

(No response.)

In opening statement, the defense counsel told the jury that certain evidence would be presented concerning what happened in the truck between Busey, Page, and the victim. The defense also said, "we do anticipate that Mr. Busey will testify sometime." The word "anticipate" is a projection but not a promise. We are not sure what the jury would have thought of the word "sometime," or the words in voir dire that it would be sometime "depending on the course of the trial," but those words also added to the impression that the defense was intending to hedge somewhat on whether defendant would testify.

This case is not like *United States v. Robinson*, 485 U.S. 25, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988), in which the defendant's counsel argued that the government had "denied defendant an opportunity to explain his side of the story." *Id.* at 26, 108 S.Ct. 864. The prosecutor then counter-argued that, "[Defendant] could have taken the stand and explained it to you, anything he wanted to." *Id.* at 28, 108 S.Ct. 864. The Supreme Court held that the prosecutor's comment did not violate de-

---

**2.** The State makes no argument that conviction of murder was a certainty or that Busey's statement to police was an admission of guilt as a matter of law. The defense theory would have been that Busey never intended for there to be a killing, and that Busey had separated himself from the matter once the robbery was complete, and therefore is not legally responsible for the murder. The defense also argued that there was insufficient evidence that Busey was involved in the robbery, but indeed the evidence of his involvement in the robbery was overwhelming. The jury could have acquitted Busey of robbery only if the jury believed that the police had fabricated Busey's admission, a proposition for which there was no evidence.

fendant's right not to be compelled to testify against himself, stating:

> [W]here, as in this case, the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by the defendant or his counsel, ... there is no violation of the privilege.

*Id.* at 32, 108 S.Ct. 864.

The *Robinson* exception was recognized in Missouri in *State v. Smith,* 752 S.W.2d 445 (Mo.App.1988). In *Smith,* the defendant did not take the stand. The defense counsel in closing referred to something defendant "said." *Id.* at 446. The prosecutor objected, and stated that "Smith never said anything in this trial." Defendant alleged the court erred in not granting a mistrial following the prosecutor's comment on his failure to take the stand. The court found, however, that although the prosecutor's comment referred to defendant's failure to testify, it fell within the *Robinson* exception because it was a fair response to defense counsel's comments. *Id.*

The comments of the defense counsel in voir dire and opening statement did not constitute a sufficiently specific commitment to fall under the *Robinson* exception. The defense counsel's statement in voir dire was part of an attempt to question the jury panel about whether they would hold it against Busey if he did not testify. In context, it was not a promise that Busey would testify. Also, any "anticipation" that Busey would testify disappeared once it was clear Page would testify in rebuttal. Thus, we cannot hold that Busey invited the comments of the prosecution concerning his failure to testify. Moreover, the

prosecution made no attempt at trial to justify the remark as a response to a perceived promise that Busey would testify. The argument could not have been a response to a defense promise and an "inadvertent slip of the tongue" at the same time. We conclude that the inadvertent remark caused sufficient prejudice to Busey as to deny him a fair trial on the charge of murder and the charge of armed criminal action associated therewith.

██ It cannot be said that the argument caused prejudice to Busey on the charge of second degree robbery and the armed criminal action associated with the robbery. Although the defense did not really concede anything, there was no evidence that Busey was not guilty of participation in the robbery.[3] There was also no issue as to whether, in connection with that robbery, Busey used a metal pipe, an instrument which, under the circumstances in which it was used (pressed against Mason's throat), is readily capable of causing death or other serious physical injury. Although no forensic evidence was presented as to an injury to Mason's throat, that fact does not demonstrate that the pipe is not capable of causing serious harm or death. Busey's own pre-trial statement was designed to admit participation in the robbery and the use of the metal pipe while seeking to separate Busey from the murder. The defense presented no evidence contrary to Busey's pre-trial statement at trial[4]. Thus, we cannot conclude that there was prejudice as to the charge of second degree robbery and the charge of armed criminal action associated therewith.

---

3. The defense argued that the jury should not believe even Busey's signed confession. However, there was no evidence supporting the notion that Busey's confession was not knowing and voluntary. The evidence of guilt at least as to the robbery was overwhelming.

4. Although Busey made an offer of proof at trial that he would have testified in the case if Page had not been available for rebuttal, he never testified in his offer of proof as to what he would have said in his testimony.

## Conclusion

We reverse the judgment of conviction as to the charge of murder and as to the armed criminal action associated therewith, and remand the case for a new trial on those charges. We affirm the convictions of robbery second degree and armed criminal action in connection with the robbery.

LOWENSTEIN and EDWIN H. SMITH, JJ., concur.